Williams vs The Gillette Co.

10/9/2003                                                    Daniel Williams

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                 DISTRICT OF CONNECTICUT
 3
        ------------------------x VOLUME I
 4
    DANIEL WILLIAMS,              :
 5
          Plaintiff,        :        COPY
 6
    -versus-              : No. 3:02CV02213(WWE)
 7
    THE GILLETTE COMPANY,      :
 8
          Defendant.        :
 9
        ------------------------x
10
11
12
13              Deposition of DANIEL WILLIAMS,
14    taken pursuant to the Federal Rules of
15    Civil Procedure, at the law offices of Day,
16    Berry & Howard, L.L.P., CityPlace I, 185
17    Asylum Street, Hartford, Connecticut,
18    before Larry Dorfman, L.S.R. #00062 and a
19    Notary Public in and for the State of
20    Connecticut, on October 9, 2003, at
21    10:30 a.m.
22
23
24
25
```

400c55f9-7854-4b86-b62c-607dbe86377a

Williams vs The Gillette Co.

10/9/2003                                                    Daniel Williams

Page 2

```
 1    A P P E A R A N C E S:
 2              For the Plaintiff:
 3         WILLIAMS & PATTIS, L.L.C.
           51 Elm Street - Suite 409
 4         New Haven, Connecticut   06510
           By:  KATARINA ENGSTROM, ESQ.
 5              (203) 562-9931
 6
           For the Defendant:
 7
           DAY, BERRY & HOWARD, L.L.P.
 8         CityPlace I - 185 Asylum Street
           Hartford, Connecticut   06103-3499
 9         By:  VICTORIA WOODIN CHAVEY, ESQ.
                SARA SIMEONIDIS, ESQ.
10              (860) 275-0100
11
12
      A L S O      P R E S E N T:
13
           Gail A. Goolkasian,
14         Assistant General Counsel
           The Gillette Company
15
16
17
18
19
20
21
22
23
24
25
```

400c55f9-7854-4b86-b62c-607dbe86377a

Williams vs The Gillette Co.

10/9/2003                                                    Daniel Williams

Page 23

1      A.    Every contact that I understood they

2   had with or without me being present, they spoke

3   in English.

4      Q.    Okay.  And did you hear your doctor on

5   January 2nd refer to depression in the

6   conversation with Mary Kinkart?

7      A.    Let me clarify one thing.

8      Q.    Could you answer my question first?

9      A.    Repeat it, please.

10               MS. CHAVEY:  Could you read it?

11               (Record read.)

12     A.    Yes.

13     Q.    And what kind of a doctor is the other

14  doctor who you mentioned?

15     A.    Psychiatrist.

16     Q.    When did you first start seeing the

17  psychiatrist?

18     A.    In September 2000.

19     Q.    And did the psychiatrist give you a

20  diagnosis of what was wrong with you?

21     A.    Same thing.  The diagnosis which

22  Dr. Bradateanu communicated to Mary Kinkart was

23  the diagnosis which Dr. Vasilescu has

24  established, but because that -- there is a time

25  difference between Romania and Eastern Standard

400c55f9-7854-4b86-b62c-607dbe86377a

Williams vs The Gillette Co.

10/9/2003                                              Daniel Williams

Page 24

1   Time, and Dr. Vasilescu was at home.  This was

2   the reason I tried to clarify and you

3   interrupted me.  Dr. Bradateanu asked

4   Dr. Vasilescu to make this call to -- this is a

5   timely procedure, because on December 29th, if

6   you remember, Mary Kinkart was not in her

7   office.

8        Q.   Who placed the call on December 29th,

9   which doctor?

10       A.   Dr. Vasilescu, the psychiatrist.

11                More than that, on January 2nd,

12  in Romania, this is a holiday, exactly like

13  January 1st.  It was, let's say, a little bit

14  of, how should I say, an extra effort to give

15  the information on a timely manner to Duracell,

16  because Mary Kinkart was not reachable before.

17  It was the holiday, new year, whatever, period.

18       Q.   Had you treated with a psychiatrist

19  prior to September of 2000?

20            THE WITNESS:  Am I obliged to

21  answer such question?

22            MS. ENGSTROM:  Yes.

23       A.   Yes.  The answer is yes.

24       Q.   When?

25       A.   Beginning I would say in maybe '98.

400c55f9-7854-4b86-b62c-607dbe86377a

Williams vs The Gillette Co.

10/9/2003                                                    Daniel Williams

Page 25

```
 1        Q.    And was it Dr. Vasilescu?

 2        A.    No.  It was a doctor here in

 3   Connecticut.

 4        Q.    Did you grow up in Romania?

 5        A.    Yes.

 6        Q.    When did you leave the country?

 7        A.    What do you mean?  I didn't leave the

 8   country.  I came here for studies.

 9        Q.    When was that?

10        A.    In '91.

11        Q.    And did you return to live in Romania?

12        A.    No.

13        Q.    After 1991?

14        A.    No.  I stayed here until September

15   2000.

16        Q.    So who was the psychiatrist with whom

17   you treated beginning in 1998?

18        A.    This is medical information.  This is

19   something I consider confidential, and I

20   personally don't see the relevance to what we

21   are considering here.

22        Q.    Mr. Williams, you need to answer my

23   question.

24        A.    If I am obliged to, if the law obliges

25   me, you don't need my approval.
```

Williams vs The Gillette Co.

Page 26

1              I have consulted a medical doctor

2    with the clear knowledge that that is

3    confidential information, and I have talked to

4    that doctor under these confidentiality, let's

5    say, rules.  If you give me a reason, good

6    reason, to give you such information, perhaps I

7    would reconsider.  Right now, I don't see that

8    reason.

9              MS. CHAVEY:  Can you instruct

10   your client to answer the question, please?

11             MS. ENGSTROM:  Could we take a

12   second out in the hall to explain to him about

13   the rules of the lawsuit?

14             MS. CHAVEY:  Sure.

15             MS. ENGSTROM:  I will be right

16   back.

17             (Recess:  10:57 to 11:00 a.m.)

18             MS. ENGSTROM:  I just want to put

19   something on the record about this question.

20   Mr. Williams is going to withdraw any claim for

21   emotional distress in connection with this case

22   and so the action is limited to economic

23   damages.

24             So on that basis, we are not

25   going to be providing you with any information

400c55f9-7854-4b86-b62c-607dbe86377a

Williams vs The Gillette Co.

Daniel Williams

Page 27

1    that would be related to emotional distress such

2    as what you are asking about.

3                    MS. CHAVEY:  But the condition

4    that he's asserting was his disability was

5    depression.

6                    MS. ENGSTROM:  Right.

7                    MS. CHAVEY:  Putting aside the

8    damages issue, we need to be able to explore his

9    medical condition, that is, the alleged

10   disability.

11                   MS. ENGSTROM:  I think that we

12   would be able to get the records from the doctor

13   in Romania, you know, pertaining to the time

14   this occurred.

15                   MS. CHAVEY:  We are entitled to

16   more than that.

17                   MS. ENGSTROM:  Well, I think that

18   we would claim that that's sufficient for

19   purposes of the case.

20                   MS. CHAVEY:  Okay.  We would

21   disagree.

22                   MS. ENGSTROM:  Fine.  Okay.

23                   MS. CHAVEY:  So --

24                   MS. ENGSTROM:  We can talk about

25   that later.

400c55f9-7854-4b86-b62c-607dbe86377a

Page 28

1              MS. CHAVEY:  We have been waiting

2      for like eight months to get him in here for a

3      deposition, or six months, so I am not prepared

4      to just postpone that issue until another day.

5              MS. ENGSTROM:  I think what we

6      have said, we will make every effort we can make

7      to get the records from the Romanian doctors

8      that would substantiate the claim in December

9      2000 and January 2001, but we are not prepared

10     to provide other medical records because we are

11     withdrawing any claim for emotional distress.

12             MS. CHAVEY:  But you will let him

13     testify as to the prior psychiatric care?

14             I'm talking about your care.

15             THE WITNESS:  It's very

16     important.

17             MS. ENGSTROM:  We should probably

18     go out in the hall.  This is not your

19     attorney --

20             THE WITNESS:  My consultation

21     with the doctors in Romania was made under

22     Romanian law.  You should take that into

23     consideration.  Romanian law does not allow

24     this. You would have to get a court in Romania

25     to allow it.  By Romanian law, which applied to

400c55f9-7854-4b86-b62c-607dbe86377a

Williams vs The Gillette Co.

10/9/2003                                                    Daniel Williams

Page 29

1   both these doctors, I don't have any

2   obligation.  They take an oath.  Take it into

3   consideration.

4                      MS. CHAVEY:  You can talk to

5   Judge Edginton about Romanian law.

6                      MS. ENGSTROM:  We will have to

7   work it out.

8                      MS. CHAVEY:  I will go ahead and

9   question him about what happened in 1998 with

10  the psychiatrist.

11                     MS. ENGSTROM:  Well, I think you

12  can ask questions about his past personal

13  history.  I think that what you were asking

14  about --

15                     THE WITNESS:  If we drop the

16  emotional distress claims, I do it because I

17  don't want to release medical information.  If

18  you want me to release, I am not going to drop

19  any emotional distress claims.  This should be

20  also very clear.

21                     MS. CHAVEY:  Can you read back my

22  last question?

23                     (Record read.)

24                     MS. ENGSTROM:  You don't want to

25  answer that question, Mr. Williams?  You don't

400c55f9-7854-4b86-b62c-607dbe86377a

Williams vs The Gillette Co.

Page 30

1    want to answer that?

2                    THE WITNESS:  I said no, yes.

3                    MS. ENGSTROM:  You don't want to

4    answer that question?

5                    THE WITNESS:  No.

6                    MS. ENGSTROM:  Okay, don't answer

7    it.

8                    MS. CHAVEY:  You are instructing

9    him not to answer?

10                   MS. ENGSTROM:  I am saying he

11   doesn't want to answer and putting it on the

12   record.

13                   THE WITNESS:  This is my wish.

14                   MS. ENGSTROM:  So that's where we

15   are, so you can go on with another question.

16                   MS. CHAVEY:  All right.  Let's

17   take a break.

18                   (Recess:  11:04 to 11:08 a.m.)

19   BY MS. CHAVEY:

20       Q.   Mr. Williams, would you tell me who

21   the psychiatrist was in Connecticut with whom

22   you treated in 1998?  "Yes" or "no."

23       A.   No.

24                   MS. CHAVEY:  And you are

25   permitting him to refuse to answer the

Williams vs The Gillette Co.

10/9/2003                                                    Daniel Williams

Page 31

1    question?

2              MS. ENGSTROM:  Yes, because we

3    are limiting our claim to economic damages, and

4    my argument is that the documentation that was

5    presented in 2000 and 2001 should be sufficient

6    for purposes of our claim.

7              MS. CHAVEY:  What documentation?

8              MS. ENGSTROM:  Whatever

9    documentation was provided.  I mean, that should

10   come out during the deposition, I would

11   imagine.  You were asking him questions about

12   it.

13       Q.   And will you tell me whether you

14   received a psychiatric diagnosis in 1998?

15       A.   I have told you already more than I

16   wanted to.  I would like to limit myself to what

17   I have already said and add nothing else.

18              And I should mention what, in

19   fact, I mentioned earlier, if you insist on

20   this, and I will answer these things somehow,

21   because you are going to oblige me, I am not

22   going to drop the emotional distress claims.

23              I am doing this based on this

24   understanding, if you insist on this and if I am

25   going to be forced to answer somehow these

400c55f9-7854-4b86-b62c-607dbe86377a

Page 32

1    questions, the limitation of my claim is not

2    going to take effect anymore.

3              I hope this condition is clear,

4    and if you don't -- if it is not clear, ask me

5    so we can clarify it.

6              MS. CHAVEY:  We have come to the

7    deposition today to get an understanding of your

8    client's claims and any evidence supporting the

9    claims.  We have been waiting a long, long time

10   to sit down for this deposition, and I am

11   extremely disappointed, I guess, to say the

12   least, that on a topic that is at the crux of

13   your claim, which is what his medical condition

14   was and whether it rises to the level of a

15   disability under the statutes that you are

16   invoking, is an area that you are willing to let

17   him refuse to answer questions about, knowing as

18   you do that the only thing that you can instruct

19   him not to answer about is attorney-client

20   privileged material, and that's obviously not

21   what we are talking about here.

22              So I am concerned about the way

23   this deposition is going, and it may be that we

24   need to suspend this and go to Judge Edginton in

25   order to get an order for your client to answer

400c55f9-7854-4b86-b62c-607dbe86377a

Williams vs The Gillette Co.

Page 33

1    the questions that are fully appropriate.

2              In addition to that, just from

3    what I have heard in the short time we have had

4    already, there are a lot of medical records that

5    we have not received, and so we need to have the

6    opportunity to question your client about that

7    as well.

8              So, you know, we could go through

9    some other things right now, but it seems to me

10   that this very critical issue is something that

11   I am entitled to get at and I shouldn't have to

12   ask other questions without having the benefit

13   of this information that I am entitled to have.

14             MS. ENGSTROM:  Well, I know

15   Mr. Williams is going to be here for a week.

16   He's planning to be here until next Wednesday.

17   Maybe we should try and call the judge right now

18   and talk to him about this.  He is only here for

19   a week.

20             THE WITNESS:  If you are entitled

21   to have it, you don't need my approval.  Get

22   it.

23             MS. ENGSTROM:  We have to talk to

24   the judge.  You have taken a position.  So, you

25   know, we have taken a position that we are

400c55f9-7854-4b86-b62c-607dbe86377a

Williams vs The Gillette Co.

10/9/2003                                                          Daniel Williams

Page 34

1    limiting it to economic damages, and so my

2    argument would be that you are not entitled to

3    this information prior to 2000.  Based on our

4    claim that it's not relevant, it wouldn't be

5    admissible at trial, so he doesn't have to

6    answer questions.

7            MS. CHAVEY:  Do you have the

8    medical records?

9            MS. ENGSTROM:  Which medical

10   records, the ones from 2000 and 2001?

11           MS. CHAVEY:  Yes.

12           MS. ENGSTROM:  What I was going

13   to do is sign an authorization while he was here

14   and we would obtain them.

15           MS. CHAVEY:  So he is going to

16   have to come back for another deposition

17   relating to those?

18           MS. ENGSTROM:  If you want to ask

19   him questions about it.

20           MS. CHAVEY:  Obviously I do.

21           MS. ENGSTROM:  I guess he would

22   have to unless we can get them faxed over here

23   in readable, legible form while he is here this

24   week, which is possible, you know, we probably

25   could do that.  Maybe we should take a break and

400c55f9-7854-4b86-b62c-607dbe86377a

Williams vs The Gillette Co.

10/9/2003                                                    Daniel Williams

Page 35

1    call.

2                    THE WITNESS:  Let me repeat one

3    thing.  Under Romanian law, which in my contacts

4    with both these doctors applies, which applies,

5    I do not have such obligation.

6                    If you are entitled to, if you

7    believe you are entitled to obtain them, get

8    them.  My permission, and I like to make clear,

9    I have the right, at least on the Romanian law.

10   Maybe under American law, too.  I am not willing

11   to release such medical records.  If you are

12   entitled, get them.

13                    MS. ENGSTROM:  I think we should

14   talk to the judge.  Maybe we can do that this

15   morning.  That would clear up a few of these

16   questions, and I can explain to Mr. Williams

17   what the judge is saying in his case.

18                    Because your case is here in

19   Connecticut.  Your case is not in Romania.  So

20   you are required, you are bound by the orders of

21   the court here.

22                    THE WITNESS:  I have gone to

23   these doctors in Romania in that country with

24   the understanding of the legal provisions which

25   are applicable there.

400c55f9-7854-4b86-b62c-607dbe86377a

Williams vs The Gillette Co.

1       A.    It started earlier, as I mentioned,

2   December, but somewhere.

3       Q.    Looking at January 2001, you were

4   trying to get a medical leave?

5       A.    Yes.

6       Q.    What were you doing during that time

7   period?

8       A.    What do you mean by that?

9       Q.    How did you spend your days?

10       A.    How does a patient spend his days?

11   Hoping to get better.  Trying to deal with the

12   symptoms of the condition.

13       Q.    Were you hospital --

14       A.    I'm sorry, please.

15            Trying to do whatever I can to

16   function as close as I was able to normal,

17   although that was almost impossible at that

18   time.  But I tried not to isolate myself from

19   everybody else.  I mean, I tried to be a social

20   person.  To the best of my ability, of course.

21   It is very difficult in such a period to do it.

22       Q.    Were you hospitalized at any time

23   between September and June?

24       A.    I went to the hospital but not -- I

25   didn't stay overnight, no.

400c55f9-7854-4b86-b62c-607dbe86377a

Williams vs The Gillette Co.

Page 58

1       Q.    When did you go to the hospital?

2       A.    Several times during this period.

3       Q.    For doctor's visits?

4       A.    Yes, for doctor's visits, yes.  The

5    doctor is in the hospital, where else?

6       Q.    Were you admitted to the hospital at

7    any time between September and June?

8       A.    I said I went for visits and I didn't

9    spend nights in the hospital.

10      Q.    Okay.  Apart from the fact that you

11   didn't spend the night in the hospital, were you

12   admitted to the hospital as a patient?

13      A.    During this period, I was not.

14      Q.    Were you ever admitted to the hospital

15   for a psychiatric issue?

16      A.    We come back to the earlier issue.  I

17   don't want to answer such a thing.

18            MR. CHAVEY:  Would you please

19   tell him to answer?

20            MS. ENGSTROM:  He says he doesn't

21   want to talk about his medical condition prior

22   to 2000.

23      Q.    Would you answer the question if your

24   lawyer told you that you had to?

25      A.    I should understand the implications

Williams vs The Gillette Co.

10/9/2003                                                          Daniel Williams

Page 59

1    very well.  Knowing the way you react and you

2    have acted toward me from the very beginning,

3    from the very first moment you have gotten

4    involved in this, I have some kind of

5    expectations what you would do with this kind of

6    information.  My answer is clearly no.

7         Q.    So even if your lawyer instructed you

8    to answer the question, you would refuse?

9              MS. ENGSTROM:  I will object to

10   continuing this because I'm not instructing him

11   to answer the question, so I would appreciate it

12   if you move on.

13             MS. CHAVEY:  I am trying to find

14   out where we are getting to.

15             MS. ENGSTROM:  It's clear.  We

16   have explained it to you.  He is not going to

17   answer any questions about his medical condition

18   prior to 2000, so I would object to your --

19             MS. CHAVEY:  You are telling him

20   that's okay.  If you were to tell him that's not

21   okay, I am wondering where we would get to then.

22             MS. ENGSTROM:  I suggested that

23   if you had questions, to call the judge,

24   please.  You have chosen not to.  Please do not

25   harass my client by asking --

400c55f9-7854-4b86-b62c-607dbe86377a

Williams vs The Gillette Co.

10/9/2003                                                   Daniel Williams

Page 60

1              MS. CHAVEY:  I am not calling a

2    federal judge without fully exploring the issue.

3              MS. ENGSTROM:  You have already

4    explored it.

5              MS. CHAVEY:  You are instructing

6    him not to answer my question about whether he

7    would answer --

8              MS. ENGSTROM:  I am requesting

9    that you call the court if you have a problem

10   with his not answering this question.  He's not

11   answering the question.  I am not instructing

12   him.  We have withdrawn the claim for emotional

13   distress.

14              We have told you he's not going

15   to respond to questions about his medical

16   condition prior to 2000, and if you have an

17   issue with it, let's call the court right now,

18   because he is only here for a week, okay?

19              I am going to get an

20   authorization from him.  I am going to try to

21   get all the records for 2000 and 2001.  I think

22   that's sufficient for purposes of our claim.

23              If you have a problem with that,

24   we should try to clear it up as quickly as

25   possible because he is just here for a week.

400c55f9-7854-4b86-b62c-607dbe86377a

Williams vs The Gillette Co.

10/9/2003                                                    Daniel Williams

Page 61

1   That's my suggestion.  But he can't help you

2   with any of those things right now.  Your only

3   recourse is to ask him other -- ask him about

4   nonmedical things or call the judge.

5                 MS. CHAVEY:  I know what my

6   recourse is and I'm trying to understand what

7   the position is that you are taking, which is

8   frankly one I don't understand given what your

9   claims are.

10                MS. ENGSTROM:  If you ask him any

11  more questions about that, we will have to stop,

12  because we have made it --  This is the third

13  time around on this.  Okay?  We drew the line.

14                MS. CHAVEY:  So when we raise

15  this issue with the court, you are going to take

16  the position that it's appropriate for him not

17  to answer the question?  Is that what I'm

18  understanding?  That's what I am trying to

19  understand.

20                MS. ENGSTROM:  Maybe we should go

21  off the record so we can talk about this a

22  little more.

23                MS. CHAVEY:  We can keep it on

24  the record.

25                MS. ENGSTROM:  I think I have

400c55f9-7854-4b86-b62c-607dbe86377a

Williams vs The Gillette Co.

Page 62

1    explained it pretty clearly.

2                    MS. CHAVEY:  But you think as a

3    legal matter, it's okay for him not to answer

4    the question?  Or is this just --

5                    MS. ENGSTROM:  What I'm saying is

6    that he's withdrawn his claim for emotional

7    distress, so his claim is for lost wages based

8    on his status in 2000 and 2001, what he reported

9    to the company during that time period, and that

10   should be sufficient for his claim so --

11                   MS. CHAVEY:  So it sounds like

12   your answer to my question is yes, that you

13   believe as a legal matter, we are not entitled

14   under the Federal Rules of Evidence or under

15   Federal Rules of Civil Procedure and discovery

16   scope --

17                   MS. ENGSTROM:  Based on that

18   claim, because his concern is about

19   confidentiality.  Apparently he would rather

20   waive the claim for emotional distress than

21   disclose that information.  If the judge --  He

22   said if the judge requires him to disclose, he

23   will reassert his claim for emotional distress

24   as part of our original complaint.  Okay?  So

25   that's where we are.

400c55f9-7854-4b86-b62c-607dbe86377a

Williams vs The Gillette Co.

1    undergone operations, yes.  She is fine.

2        Q.    Are you still helping to care for your

3    mother?

4        A.    Not the way I did in 2000.  It was a

5    period when I felt it's a critical moment, and

6    with God's help, we made it at least this far.

7        Q.    When had your father died?

8        A.    I should mention even though, once

9    again, for the record, Duracell was helpful at

10   that time, something happened later.  This is

11   something I think you should try to understand.

12   My father died in 1999, the end of '99, the end

13   of previous year.

14       Q.    Were you under the treatment of a

15   psychiatrist in the United States in 2000?

16       A.    I have answered this line of

17   questioning.  The answer is the judge decides

18   obliges me to do it, although if you are

19   entitled to this, to these things, you can get

20   them without my approval.  If the law allows you

21   to do it, you don't need my approval.  Get

22   them.  I cannot stop you.  I don't wish to give

23   this information, but I am sure you have the

24   means to obtain it without my approval.

25                MS. CHAVEY:  Are you allowing him

400c55f9-7854-4b86-b62c-607dbe86377a

Williams vs The Gillette Co.

Page 70

```
 1    to not answer questions?
 2                   MS. ENGSTROM:  What time is it
 3    now?
 4                   MS. CHAVEY:  It's five after
 5    12:00.
 6                   I was wondering whether you are
 7    going to allow him not to answer questions about
 8    2000, because I thought you said 2000 and 2001
 9    was all right.
10                   MS. ENGSTROM:  What I meant by
11    that was the time that he went out on leave, you
12    know, from the time he went out on leave and he
13    apparently started seeing the doctor.
14                   If he wasn't want to answer
15    questions -- See, the way it works in a
16    lawsuit, even if the court orders the document
17    to be produced, we still would need to get an
18    authorization, you would still need to sign an
19    authorization that we would send to your doctor,
20    so that's how it would work.  So do you prefer
21    that we go that route or do you want to answer
22    questions?
23                   THE WITNESS:  I will answer.
24    Whichever.
25         A.    The answer is yes.
```

Williams vs The Gillette Co.

10/9/2003                                                    Daniel Williams

Page 71

1      Q.    Who was that doctor?

2      A.    His name is Cohen, C-o-h-e-n.

3      Q.    First name?

4      A.    Eric.   David maybe.   Eric Cohen.

5   Maybe David, I don't know.   Eric Cohen anyway.

6      Q.    What town was his office in?

7      A.    He moved during that time.   I forgot

8   exactly.   I think he was in Hartford.   The last

9   time I went to see him, I think he was in

10  Hartford.

11     Q.    When was that last time that you went

12  to see him?

13     A.    Sometime in the summer of 2000.   What

14  exact date, I don't remember.

15     Q.    Why did you stop seeing him?

16     A.    Because I was far away.   I was in

17  Romania.

18     Q.    And how long had you been treating

19  with him?

20     A.    Since '98.

21     Q.    Was he associated with Hartford

22  Hospital, do you know?

23     A.    No, I don't.

24     Q.    Why did you seek treatment from him

25  starting in '98?

400c55f9-7854-4b86-b62c-607dbe86377a

Williams vs The Gillette Co.

Page 72

1     A.   Well, people around me, I guess,

2   suggested that it would be perhaps helpful, and

3   I said I will give it a try and see if indeed

4   that is the case, and he confirmed it was indeed

5   a good idea to come and see him.

6     Q.   Who suggested to you that you go?

7     A.   Maybe my former wife, maybe my mother,

8   maybe somebody else in my -- I don't know,

9   circle of friends, I don't know.  Somebody.  I

10  don't remember whom.  Quite likely, my mother.

11  I think my mother was the one because she is the

12  one that cared about me.

13    Q.   And did Dr. Cohen give you a

14  diagnosis, some sort of condition?

15    A.   I believe he did, but don't ask me

16  what it was because I don't remember.

17    Q.   Did he give you any medication?

18    A.   Yes.

19    Q.   What was the medication?

20    A.   I don't remember.  I don't remember.

21  There were several.

22    Q.   Was it Prozac?

23    A.   One of them indeed was this, yes.  One

24  of them -- this I can confirm, one of them was

25  this.

400c55f9-7854-4b86-b62c-607dbe86377a

Williams vs The Gillette Co.

10/9/2003                                          Daniel Williams

Page 73

1        Q.    And when did you start taking Prozac?

2        A.    I cannot specify a certain moment.

3    Sometime after I started seeing him.

4        Q.    What month in 1998 did you start

5    seeing him?

6        A.    Hard to say.  Hard to say.

7        Q.    Do you remember whether it was --

8        A.    I have approximated, I mean, summer or

9    fall of '98 maybe.  I don't know.  I would say,

10   very rough, somewhere in the middle of '98.  God

11   knows, I don't remember exactly.

12       Q.    Did you start taking Prozac soon

13   thereafter?

14       A.    I cannot --  I don't know.  I don't

15   remember.  Likelihood is yes.  You are asking me

16   something which I really cannot answer.

17       Q.    And how often did you go see Dr. Cohen

18   between mid-'98 and the time you went to

19   Romania in 2000?

20       A.    I think it varied.  It was his

21   decision.  I remember he said, "Come and see me

22   in a week, in a month, whatever, or give me a

23   call and schedule an appointment," something

24   like this.  I think it was most of the time.

25       Q.    So did you see him on some type of

400c55f9-7854-4b86-b62c-607dbe86377a

Williams vs The Gillette Co.

10/9/2003                                                    Daniel Williams

Page 74

1    regular basis throughout that two-year period?

2         A.    Hard to say because I don't remember.

3    I mean, it depends very much on how often I

4    went, but I don't remember.

5                I did see him several times, yes,

6    but I think it was mostly -- his suggestion

7    mostly was "See how you feel, see how you feel

8    in a week or see how you feel in a month, and if

9    things don't get better, give me a call and

10   schedule an appointment."  I think something

11   like this, this was mostly how it went.

12        Q.    And before you went to work at

13   Duracell, were you working somewhere else?

14        A.    Yes.

15        Q.    Where was that?

16        A.    Jacobs Vehicle Systems.

17        Q.    How long did you work there?

18        A.    About four years.  Four years.

19        Q.    You were working there when you

20   started treating with Dr. Cohen?

21        A.    Yes.

22        Q.    And when did you leave Jacobs?

23        A.    Just before I came to Duracell,

24   shortly, a few, I don't know, two or three

25   months before I started to at Duracell.

400c55f9-7854-4b86-b62c-607dbe86377a

Williams vs The Gillette Co.

10/9/2003                                                                    Daniel Williams

Page 86

1    BY MS. CHAVEY:

2        Q.   Mr. Williams, after having had a lunch

3    break of a little over an hour, are you ready to

4    begin answering my questions again?

5        A.   Yes.

6        Q.   Do you have anything that you would

7    like to add to or change from your testimony

8    this morning?

9        A.   I am here to answer your questions,

10   so, no, no additions, no changes.

11       Q.   Okay.

12           MS. ENGSTROM:   Could I put on the

13   record that we had a conversation that we agreed

14   that we are going to provide the records from

15   his doctors and that we are asserting the

16   emotional distress claim?

17           MS. CHAVEY:   Okay.

18           MS. ENGSTROM:   Thanks.   Subject

19   to a confidentiality agreement.

20           MS. CHAVEY:   Right, if -- I am

21   sure we can work it out.   We are perfectly

22   amenable to doing that.   It's just a matter of

23   figuring out what the provisions are.

24       Q.   You were telling me before we took a

25   break what kinds of daily activities in which