LEXSEE 1997 U.S. DIST. LEXIS 8339

**ROSEMARY PATTERSON, Plaintiff, v. CHICAGO ASSOCIATION FOR RETARDED CHILDREN, an Illinois not-for-profit corporation, Defendant.**

96 C 4713

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

1997 U.S. Dist. LEXIS 8339

June 5, 1997, Decided
June 6, 1997, DOCKETED

**DISPOSITION:** [*1] Defendant's motion for summary judgment granted.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** For ROSEMARY PATTERSON, plaintiff: Gerald A. Goldman, Arthur R. Ehrlich, Jonathan C. Goldman, Law Offices of Gerald A. Goldman, Chartered, Chicago, IL.

For CHICAGO ASSOCIATION FOR RETARDED CITIZENS, An Illinois Not-For-Profit Corporation, defendant: Lawrence I. Kipperman, Sidley & Austin, Chicago, IL. Sonja L. Lengnick, Sidley & Austin, Chicago, IL.

**JUDGES:** Charles P. Kocoras, United States District Judge

**OPINIONBY:** Charles P. Kocoras

**OPINION:**

### MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This matter is before the court on the defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons set forth below, this motion is granted.

### BACKGROUND

Before we turn to a discussion of the facts of this case, we must address the affidavit of plaintiff Rosemary Patterson ("Patterson") which was attached to her response to the defendant's motion. In sharp contrast to her deposition testimony, where Patterson answered innumerable questions "I don't know, sir", her affidavit in response to the defendant's motion is clear and detailed and responds to specific points contained in the defendant's 12(M) Statement. [*2] This affidavit is the primary evidence on which Patterson relies to refute the defendant's 12(M) statement, and is one of only a handful of exhibits attached to her response.

It is clearly established in the Seventh Circuit that "self-serving affidavits without factual support in the record will not defeat a motion for summary judgment." Unterreiner v. Volkswagen of America, Inc., 8 F.3d 1206, 1210 (7th Cir. 1993), quoting Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993). Also, when a party has been deposed and later files an affidavit which differs from the deposition testimony, "if the later statement is sufficiently unlikely-- to the point of unreliable-- then it cannot be used to created a 'genuine issue of material fact.'" Unterreiner, 8 F.3d at 1210. Both of these circumstances are present in this case, and we will not rely upon Patterson's affidavit in deciding this motion. Patterson's affidavit consists mainly of flat denials that incidents related in the defendant's 12(M) statement occurred, but there is no independent evidence submitted to support her claims. These self-serving denials are not considered evidence for the purposes of establishing [*3] that a genuine issue of material fact exists in this case, and we will not consider them.

The following facts are gleaned from the defendant's 12(M) Statement and the related exhibits. Plaintiff, Rosemary Patterson ("Patterson") was hired by defendant Chicago Association for Retarded Children ("CARC" or "defendant") in 1982 as a certified teacher. CARC is a not-for-profit corporation that provides services to developmentally disabled adults and children. One of the services it performs is operating six special education schools which provide intensive teaching and therapy to severely mentally disabled children. In a typical classroom, there is a certified teacher and a teacher's assistant. In the classroom, the teacher has the responsibility of ensuring the safety of the students, recognizing any potential medical problems, implementing and developing behavioral management programs, and preventing students from "acting out." As such, the job description of a CARC "Teacher IV" lists as an essential requirement "Overall supervision of assigned students at all times."

In 1974, Patterson experienced paranoia and began to take an anti-psychotic medication. She has taken various medications [*4] for mental illness since that time. Patterson was hospitalized for paranoia on two different occasions before she came to teach at the Nelson School, and was given a six-week medical leave in 1988. In 1993, Patterson moved from the school she had been teaching at to the Nelson School. At that time, Evelyn Nelson, the school director, had no knowledge of Patterson's previous hospitalization or paranoia. While at Nelson, in 1994 and 1995, various people who work at Nelson observed Patterson exhibiting odd behavior, including staring out into space, not being involved with her children, and her seeing writing, numbers, and other things which were not actually there. At various times, Evelyn Nelson asked Patterson if she was taking her medication, to which she responded "No."

On March 28, 1995, Patterson's psychiatrist believed that she was unable to perform the duties of her job, and he wrote a note to CARC asking that she be allowed to have two to four weeks' leave from work. A four week leave was approved, and on April 26, 1996, her doctor noted that she was improved and complying with taking her medication. At this time, he approved her to return to CARC and gave her a note to that [*5] effect. Patterson's performance upon her return was fine for the first week, but she then once again began to exhibit inappropriate behavior. On May 15, Patterson called in to work and, in a monotone voice, stated that she was sick. Evelyn Nelson tried to ask Patterson if she was seeing her doctor, but Patterson hung up without answering. Patterson repeated this procedure on May 16, 17, and 18, and did not inform anyone of the nature of her illness or of the fact that she needed accommodations. On May 18, 1995, CARC sent a termination letter to Patterson, which stated that she was being terminated "In view of the excess number of times in which you have exhibited inappropriate behavior...."

On July 19, 1995, Patterson filed a charge of discrimination with the Equal Employment Opportunity Commission pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et. seq. On May 31, 1996, the EEOC issued a right to sue letter to Patterson, and she thereafter commenced this present suit. In response, the defendant has moved for summary judgment. Before we examine the defendant's motion, we will outline the legal standard that guides our inquiry.

**LEGAL STANDARD [*6]**

Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Once a motion has been filed for summary judgment, the burden shifts to the nonmoving party to show through specific evidence that a triable issue of fact remains on issues on which the nonmovant bears the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with proper documentary evidence. Id. With this in mind, we turn to the merits of the present motion.

**DISCUSSION**

As another preliminary matter, we must address a contention of the plaintiff in her response to the defendant's motion. In its 12(M) Statement of Uncontested Facts, the defendant relies upon an affidavit and some medical records produced by Yogi K. Ahluwalia, M.D. ("Dr. Ahluwalia"). In her response, Patterson argues that [*7] Dr. Ahluwalia's affidavit should be stricken because it violates the physician-patient privilege and is thus inadmissible evidence. A response to a motion for summary judgment, however, is not the appropriate place to raise such a concern, and we will not entertain it. Patterson had plenty of time between the filing of the defendant's motion and the present to file a motion to strike consistent with Local Rule 12, and her failure to do so has caused this objection to be forfeited.

Even if we were to examine the merits of Patterson's contentions, we would allow Dr. Ahluwalia's testimony to be used by the defendant. First, the defendant presented a motion to subpoena medical records from and take the deposition of Dr. Ahluwalia which was unopposed by Patterson and which was granted on February 11, 1997. See Rec.Docs. 4 and 7. By failing to

object at this stage, Patterson essentially waived her claim to privilege, and the information gleaned via the subpoena may be used by CARC. See, e.g., Jordan v. Kelly, 728 F.2d 1, 3 (1st Cir. 1984)("A party who presents or fails to object to testimony of an allegedly privileged nature waives whatever privilege might have existed as to that [*8] testimony."). Furthermore, Patterson waived any privilege she may have been able to claim by putting her mental condition at issue in this case. The Supreme Court has stated that the psychotherapist-patient privilege may be waived by the patient, just like any other privilege. Jaffee v. Redmond, U.S. , 135 L. Ed. 2d 337, 116 S. Ct. 1923, 1931 fn.14 (1996). Thus, "ADA plaintiffs, like all plaintiffs in an action for medical malpractice, waive all privileges and privacy interests related to their claim by virtue of filing the complaint." Butler v. Burroughs Wellcome, Inc., 920 F. Supp. 90, 92 (E.D.N.C. 1996). By stating in her complaint that "Plaintiff is disabled and suffers from a mental illness" (see Complaint P3), Patterson put her mental condition at issue and waived any claims of privilege to relevant information that her psychiatrist might possess. Thus, even if we were to have considered the merits of Patterson's arguments to strike Dr. Ahluwalia's testimony and records, we would have denied her request and considered his testimony.

In order to establish a claim of discrimination under the ADA, a plaintiff must show: 1) that she is "disabled" within [*9] the meaning of the ADA; 2) that she is qualified for the job which she was performing; and 3) that the employer terminated her because of her disability. Miller v. Dep't of Corrections of the State of Illinois, 916 F. Supp. 863, 866 (C.D.Ill. 1996), aff'd, 107 F.3d 483 (7th Cir. 1997), citing White v. York Int'l Corp., 45 F.3d 357, 360 (10th Cir. 1995). Because we find that Patterson has failed to establish that she is "disabled", her claim fails as a matter of law and the defendant's motion is granted.

Under the ADA, a "disability" is defined as:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such impairment.

See 42 U.S.C. § 10202(2). "Major life activities" include such things as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. See 29 C.F.R. § 1630.2(i). The only one of these activities which Patterson may have been limited in performing is working, since there is no evidence regarding any of the others, and we will focus on it.

For [*10] purposes of "working", being substantially limited means being "significantly restricted in the ability to perform either a class of jobs or broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." See 29 C.F.R. § 1630.2(j)(3)(i). See also Roth v. Lutheran General Hospital, 57 F.3d 1446, 1454 (7th Cir. 1995). Thus, "'an inability to perform a particular job for a particular employer' is not sufficient to establish a substantial limitation on the ability to work"; instead, "'the impairment must substantially limit employment generally." Weiler v. Household Finance Corp., 101 F.3d 519, 524 (7th Cir. 1996), quoting Byrne v. Board of Education, School of West Allis-West Milwaukee, 979 F.2d 560, 565 (7th Cir. 1992). Patterson has offered no evidence to show that her mental condition substantially limits her ability to engage in employment generally, and she has not shown that she is disabled.

The defendant has offered substantial uncontroverted evidence to show that Patterson's mental condition affected her ability to teach disabled or retarded children but not her teaching ability in general. Teachers [*11] at CARC must be vigilant and able to recognize when a student is experiencing a medical problem, since many of the children cannot communicate verbally; thus, careful observation of the students' demeanor and behavior is necessary. See Defendant's 12(M) Statement P10. The teachers also had to actively participate in the children's education, including taking them into the community to teach them daily living skills. Id. at PP14-22. When out in the community, a teacher was responsible for the safety of the students, and had to make sure that none of them ran away. Id. at P23. Ample evidence in the defendant's motion shows that Patterson was not able to meet the requirements of a CARC teacher, and that she was not performing her job satisfactorily. For example, Patterson was observed in her classroom "distracted, and paid attention to the children only when they came to her." Patterson did not initiate any activities with the children, but sat by herself in the far end of the room staring into space. See 12(M) Statement P56. The defendant's undisputed evidence, then, shows that Patterson was unable to handle the duties of teaching disabled children at CARC.

The undisputed [*12] evidence also shows that Patterson, subsequent to her termination at CARC, has been employed as a substitute teacher for the Chicago Board of Education. The children that she teaches now are neither retarded nor disabled. See Defendant's 12(M) Statement P98. Thus, Patterson is engaged in the same general field as she was at CARC: education. She has offered no evidence to show that she has difficulty

meeting the requirements of her current teaching job, and she has not established that her mental condition substantially limits her ability to work. As such, Patterson has not set forth that she is "disabled" under the ADA and her claim must fail. Furthermore, Patterson, outside of general allegations in her response to the motion, has not set forth any facts which show that the she had a record of a mental impairment or was perceived as being mentally disabled. Accordingly, we grant the defendant summary judgment.

**CONCLUSION**

For the reasons set forth above, the defendant's motion for summary judgment is granted.

Charles P. Kocoras

United States District Judge

Dated: June 5, 1997

**JUDGMENT IN A CIVIL CASE**

IT IS ORDERED AND ADJUDGED that summary judgment [*13] is entered in favor of the defendant and against plaintiff. Plaintiff to take nothing. All matters in controversy having been resolved, final judgment is hereby entered.

June 5, 1997
Date

LEXSEE 2003 U.S. DIST. LEXIS 11508

**INTERNET LAW LIBRARY, INC. and HUNTER M.A. CARR, Plaintiffs, -against- SOUTHRIDGE CAPITAL MANAGEMENT, LLC, et al., Defendants. COOTES DRIVE, LLC., Defendant, Counterclaim-Plaintiff, -against- INTERNET LAW LIBRARY, INC., Plaintiff, Counterclaim-Defendant. Jack Tompkins, Kerwin Drouet, et al., Plaintiffs, -against- SOUTHRIDGE CAPITAL MANAGEMENT, et al., Defendants.**

01 Civ. 6600 (RLC), 02 Civ. 0138 (RLC)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2003 U.S. Dist. LEXIS 11508; 55 Fed. R. Serv. 3d (Callaghan) 1138; Fed. Sec. L. Rep. (CCH) P92,461

July 7, 2003, Decided
July 8, 2003, Filed

**PRIOR HISTORY:** Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC, 223 F. Supp. 2d 474, 2002 U.S. Dist. LEXIS 13172 (S.D.N.Y., 2002)

**DISPOSITION:** [*1] Defendants' motion for sanctions dismissing complaint granted.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** For Internet Law Library, Inc.: MARYANN PERONTI, Of Counsel, KOERNER SILBERBERG & WEINER, LLP, New York, New York.

For Internet Law Library, Inc.: JAMES W. CHRISTIAN, GARY M. JEWELL, Of Counsel, CHRISTIAN, SMITH & JEWELL, Houston, Texas.

For Internet Law Library, Inc.: JAMES W. CHRISTIAN, RICHARD L. TATE, Of Counsel, TATE & ASSOCIATES, Richmond, Texas.

For Southridge Capital Management LLC, Cootes Drive LLC, Stephen Hicks, Daniel Pickett, Christy Constabile, David Sims, and Navigator Management Ltd.: PALMINA M. FAVA, PERRIE M. WEINER, CARYN G. MAZIN, Of Counsel, PIPER RUDNICK, New York, New York.

For Citco Group Limited: MICHAEL J. DELL, Of Counsel, KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, New York.

For Southridge Capital Management LLC, Cootes Drive LLC, Stephen Hicks, Daniel Pickett, Christy Constabile, David Sims, and Navigator Management Ltd.: AMY M. CAVES, MICHAEL S. ROSENBLUM, Of Counsel, LAW OFFICES OF MICHAEL S. ROSENBLUM, Los Angeles, California.

For Mark [*2] Valentine: JOEL C. HAIMS, CARL H. LOEWENSON, JR., JAMES E. JOHNSON, Of Counsel, MORRISON & FOERSTER LLP, New York, New York.

For Thomson Kernaghan & Co, Ltd., and TK Holdings, Inc.: DEBRA A. CLIFFORD, Of Counsel, GIBBONS, DEL DEO, DOLAN, GRIFFINGER & VECCHIONE, PC, New York, New York.

**JUDGES:** ROBERT L. CARTER, U.S.D.J.

**OPINIONBY:** ROBERT L. CARTER

**OPINION:** ROBERT L. CARTER, District Judge

Defendants Southridge Capital Management LLC, Stephen Hicks, Daniel Pickett, Christy Constabile, David

Case 3:02-cv-02213-WWE    Document 25-2    Filed 03/05/2004    Page 6 of 17

Page 2
2003 U.S. Dist. LEXIS 11508, *; 55 Fed. R. Serv. 3d (Callaghan) 1138;
Fed. Sec. L. Rep. (CCH) P92,461

Sims, Navigator Management Ltd., The Citco Group Limited and Citco Trustees Limited move to dismiss the complaint brought by plaintiffs, ITIS Holdings Inc. ("ITIS") (f/k/a ITIS Inc. and Internet Law Library), Hunter Carr, Kerwin Drouet, and Jack Tompkins pursuant to Rule 37(b)(2), F.R. Civ. P., due to plaintiffs' abuse of the discovery process and persistent refusal to abide by the court's discovery orders.

**Background**

The underlying action originally brought by plaintiffs alleges fraud, misrepresentation of material facts, manipulation of ITIS' stock in violation of federal and state laws, control person liability claims, tortious interference with contract, and breach of contract, all in connection [*3] with defendants' investment in ITIS by means of a Convertible Stock Purchase Agreement entered into on or about May 11, 2000. Plaintiffs request relief that includes amongst other remedies: rescission of all agreements between the parties, declaratory relief excusing ITIS from performance of its duties under the Convertible Stock Purchase Agreement, and damages and costs that total more than $ 300 million. In the two years the parties have litigated this action the court has dealt with various issues, see, e.g., Internet Law Library v. Southridge Capital Mgmt. LLC, 208 F.R.D. 59 (S.D.N.Y. 2002); Internet Law Library v. Southridge Capital Mgmt. LLC, 223 F. Supp. 2d 474 (S.D.N.Y. 2002), with which familiarity is assumed.

This request for dismissal follows several attempts by plaintiffs to override and misconstrue the authority of this court. Plaintiffs' pattern of disrespect for the court's rulings began with a conference held in chambers on September 26, 2002. The purpose of this conference was to set a timeframe for discovery and the filing of dispositive motions as well as resolve any open disputes between the parties. During the conference, defendants [*4] alleged that plaintiffs were using discovery to shop for new parties and requested a protective order for all document productions. In response, plaintiffs acknowledged they were inquiring with nonparties about defendants' actions but denied the allegations they were shopping for more plaintiffs. Plaintiffs claimed that defendants employed a financing scheme, similar to the one used with ITIS, to defraud many other companies and as a result these nonparty companies may have information relevant to the allegations of market manipulation and fraud in plaintiffs' complaint.

Taking into account plaintiffs' and defendants' arguments, the court placed its trust in plaintiffs' sense of restraint and denied the protective order. The court indicated that any information gained in discovery was not to be used to identify new clients or initiate new litigation but that it could be used to "locate additional witnesses or join new parties on a showing of good cause." (Endorsement Oct. 3, 2002). In addition, the court indicated that in the event plaintiffs wanted to use any information gained in discovery before another judge in a different litigation, the use of such information would be subject [*5] to the ruling of the presiding judge. This was in sum and substance the court's ruling on the scope of discovery made in the September conference.

Judging from their subsequent actions, plaintiffs interpreted the court's ruling to entitle plaintiffs to request every manner of discovery from defendants and nonparties with regard to all companies that bore a resemblance to the way in which ITIS was financed or its stock was sold. Using this interpretation, plaintiffs served subpoenas on February 3, 2003, under the ITIS caption, to the National Association of Securities Dealers ("NASD") and the National Securities Clearinghouse Corporation ("NSCC") in which they requested the records of trading in ATSI Communications ("ATSI") securities by the following companies: The Shaar Fund, Ltd., Levinson Capital Management, Shaar Advisory Services, N.V., Marshall Capital Services, LLC, Jessup & Lamont Structured Finance Group, RGC International Investors, LDC, Rose Glen Capital Management, L.P., MG Security Group, Inc., Corporate Capital Management, and Crown Capital Corporation. Every company referred to in the subpoenas is a party before Judge Lewis Kaplan in the ATSI Communications v. The [*6] Shaar Fund, 2003 U.S. Dist. LEXIS 5763, No. 02 Civ. 8726 (S.D.N.Y.), action. None of them, however, are parties to the action before this court. The only common thread between the ATSI case and the ITIS case is that plaintiffs in both cases are represented by the same counsel, Maryann Peronti of Koerner Silberberg & Wiener, LLP and Gary Jewell of Christian Smith & Jewell.

In a February 24, 2003 conference before Judge Kaplan in the ATSI matter, the ATSI defendants, only recently informed of the subpoenas, brought them to the attention of Judge Kaplan. In defending the subpoenas, Ms. Peronti failed to produce the October 3, 2002 Endorsement upon which she was relying for her alleged authorization and misrepresented to Judge Kaplan that they were issued with the permission of this court. She further defended the subpoenas as a permissible search for pattern and practice evidence, alleging that there were factual alliances between defendants in the ATSI and ITIS cases such as to make the actions of the ATSI defendants in trading ATSI's stock relevant to allegedly similar manipulations of ITIS' stock by the ITIS defendants. When Judge Kaplan inquired into whether Ms. Peronti had advised this court that she planned [*7] to use the subpoenaed information in the ATSI action, in

Case 3:02-cv-02213-WWE    Document 25-2    Filed 03/05/2004    Page 7 of 17

Page 3

2003 U.S. Dist. LEXIS 11508, *; 55 Fed. R. Serv. 3d (Callaghan) 1138;
Fed. Sec. L. Rep. (CCH) P92,461

which discovery was stayed by the Private Securities Litigation Reform Act ("PSLRA"), she admitted she had not done so. Judge Kaplan effectively barred plaintiffs from using the subpoenaed information in the ATSI case and left the relevance of the subpoenas in the ITIS case for this court to decide. ATSI Communications, Inc., v. The Shaar Fund, Ltd., 2003 U.S. Dist. LEXIS 5763, No. 02 Civ. 8726, 2003 WL 1877227, at *3 (S.D.N.Y. April 9, 2003).

On June 9, 2003, the court held a conference in chambers in which the validity of the ATSI subpoenas as well as plaintiffs' attempts to secure discovery of defendants' trading records with regard to nonparties were considered. After hearing arguments from both parties, including plaintiffs' claim that the ATSI subpoenas were issued simply in an attempt to find pattern and practice evidence of defendants' manipulative investment schemes, the court made it very clear that the substance of the October 3, 2003 Endorsement was that plaintiffs were to seek witnesses and not trading records with regard to nonparties. (Tr. of June 9, 2003 Conference, p. 6.) The court quashed the subpoenas and barred plaintiffs [*8] from making "any other efforts in this regard." (Id. at p. 9.) In addition the court warned plaintiffs that "any further violation of my order in any way, [and] I'm going to dismiss your case." (Id. at p. 10.)

On June 10, 2003, the day after this ruling, plaintiffs served defendants with notice that plaintiffs would be serving a subpoena on the NASD seeking every short sale made since March 30, 1999, irrespective of the identity of the stock or the trader. On June 11, 2003, defendants, by letter, moved to quash the subpoenas and also brought the present motion to dismiss in light of plaintiffs' clear violation of the court's order. The subpoenas were quashed immediately and the court requested that plaintiffs justify their actions promptly so that the court could rule on defendants' motion. Plaintiffs' response by letter on June 18, 2003, in essence indicates that its justification lies in the court's lack of clarity when it barred plaintiffs from making "any other efforts in this regard." (emphasis added) (Id. at p. 9.) Without knowing whether 'this' referred specifically to the ATSI subpoenas or to discovery in trading records of nonparties in general, plaintiffs argue [*9] that they could not have violated any order as the order the court gave was so unclear as to not exist for all practical purposes.

Discussion

Rule 37(b)(2)(C), F.R. Civ. P., authorizes dismissal of a plaintiff's complaint along with other sanctions by the district court if a party "fails to obey an order to provide or permit discovery." Dismissal is the harshest sanction available to a district court, and should thus "be imposed only in extreme circumstances." Jones v. Niagara Frontier Transp. Auth., 836 F.2d 731, 734-35 (2d Cir. 1987). Accordingly, dismissal is appropriate only where a party who has disobeyed an order has done so willfully, in bad faith, or is in some way at fault. Gilpin v. Philip Morris Int'l, Inc., 2002 U.S. Dist. LEXIS 12181, No. 01 Civ. 5960, 2002 WL 1461433 (S.D.N.Y. July 8, 2002) (Carter, J.).

It is clear that the court never gave any permission in the September conference, explicit or otherwise, to plaintiffs to issue the ATSI subpoenas in the manner that they represented to Judge Kaplan. In issuing its order, the court intended that plaintiffs could use defendants' discovery to seek witnesses, be they parties or nonparties, that plaintiffs reasonably [*10] believed to have information supporting the allegations in their complaint. This is the only reference to nonparties in the order, and there was no more expansive discussion regarding nonparties in the conference that went unreflected in the order. The issue of nonparty trading records was never raised and in making such an unsupported claim to this court as well as to Judge Kaplan, plaintiffs all but fatally jeopardize their credibility.

In issuing the ATSI subpoenas, plaintiffs not only violated and misrepresented the court's ruling to Judge Kaplan, but they also attempted to violate the discovery stay mandated by the PSLRA in the ATSI case. The PSLRA provides in relevant part:

> In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

See 15 U.S.C. § 78u-4(b)(3)(B).

Plaintiffs' claim that the ATSI subpoenas were not intended for use in the ATSI case but rather could lead to the discovery [*11] of relevant evidence in this case is not supported by facts. The only alleged factual connection between the subpoenas and the ITIS case is the presence of one of defendant Citco Group Limited's hundreds of subsidiaries in filings that one of the subpoenaed broker/dealers made with the SEC. This connection, however, is so tenuous in comparison to the obvious utility the subpoenaed information had in assisting counsel to amend the ATSI complaint to defeat the ATSI defendants' motion to dismiss, as to make clear that plaintiffs intended to abuse this court's subpoena power to circumvent the PSLRA's constraints in the

Case 3:02-cv-02213-WWE    Document 25-2    Filed 03/05/2004    Page 8 of 17

Page 4

2003 U.S. Dist. LEXIS 11508, *; 55 Fed. R. Serv. 3d (Callaghan) 1138;
Fed. Sec. L. Rep. (CCH) P92,461

ATSI case. See ATSI, 2003 U.S. Dist. LEXIS 5763, 2003 WL 1877227, at *3.

On its own, plaintiffs' abuse of the subpoena power would justify severe sanctions. In combination with plaintiffs' subsequent disregard for the court's order in the June 9, 2003 conference, plaintiffs' conduct warrants dismissal of their complaint. Plaintiffs defend their actions by claiming that they did not understand the court's order to include all nonparty discovery when it barred plaintiffs from making any more efforts "in this regard." In light of plaintiffs' vigorous defense of the ATSI subpoenas in [*12] the conference as part of their effort to find a pattern and practice of manipulative investments in nonparties, this alleged misunderstanding seems impossible. Furthermore, even if the court's order was unclear in some respects, it was absolutely clear with regard to ATSI, and the issuance of the second NASD subpoena does not reflect even the understanding that ATSI records were off limits.

Plaintiffs seem to believe that by playing innocent they can escape their duty to be a responsible litigant. The inexplicably self destructive nature of plaintiffs' action in serving the second NASD subpoena on defendants, considering the court's ruling and warning, can only be understood by the court as a willful attempt to try this case as they see fit, and not in the way the court has ordered or that law requires. Were plaintiffs proceeding *pro se,* the court would be more apt to believe plaintiffs misunderstood the court's order or made careless errors by failing to omit ATSI from the second NASD subpoena. These plaintiffs, however, are represented by experienced counsel. Based on their disregard for the court's orders and discovery rules in the past, the court can only conclude that their [*13] behavior with regard to the latest subpoena was willful and in bad faith, just as it was with the ATSI subpoenas.

Due to the harshness of dismissal, the court has considered other sanctions but does not find them to be as effective considering the circumstances of plaintiffs' transgressions. For example, an adverse inference instruction is not applicable as the subject matter of plaintiffs' actions, defendants trading in nonparties, is actually not relevant to plaintiffs' burden of proof and thus would be no punishment at all. The court also believes that monetary sanctions would not effectively deter future misconduct were this litigation to continue due to plaintiffs' failure to heed the court's explicit warning that any further violations would result in dismissal. Plaintiffs' conduct has diverted the court's attention from the efficient adjudication of this case and its case docket, despite clear warnings and orders to adhere to plaintiffs' obligations as litigants. This failure to respect the court and its orders justifies dismissal of plaintiffs' complaint as both a remedy and a deterrent to future misconduct. See United States Freight Co., v. Penn Central Transp. Co., 716 F.2d 954, 955 (2d Cir. 1983). [*14]

### Conclusion

Plaintiffs' complaint is dismissed pursuant to Rule 37(b)(2), F.R. Civ. P., as to all defendants with prejudice due to plaintiffs' repeated and flagrant disregard for the court's orders.

**IT IS SO ORDERED**

Dated: July 7, 2003

    **ROBERT L. CARTER**

    U.S.D.J.

LEXSEE 1999 U.S. DIST. LEXIS 12395

**J-SQUARE MARKETING, INC., Plaintiff, -against- SIPEX CORP., ALTERA CORP., DATCOM TECHNOLOGIES, INC., CATHERINE HARRINGTON, EMIL VARANO, DAVID MASON, JOHN SALZILLO, and PATRICK COUGHLIN, Defendants.**

3:97-cv-924 (GLG)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

**1999 U.S. Dist. LEXIS 12395**

**August 9, 1999, Decided**

**DISPOSITION:** [*1] Magistrate Judge Garfinkel's Recommended Ruling adopted, approved and ratified. Plaintiff's objections to Recommended Ruling (Doc. # 204) DENIED.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** For J SQUARE MKTG, INC, plaintiff: David J. Robertson, Bai, Pollock & Coyne, Bridgeport, CT.

For J SQUARE MKTG, INC, plaintiff: Charles E. Reuther, Kral, Clerkin, Redmond et al., Morristown, NJ.

For SIPEX CORP, EMIL VARANO, defendants: Christopher Brigham, Mary Catherine Healy, Updike, Kelly & Spellacy, P.C., New Haven, CT.

For SIPEX CORP, EMIL VARANO, defendants: Joseph M. Burke, Russo & Burke, New York, NY.

For SIPEX CORP, EMIL VARANO, defendants: Max Perlman, Sullivan, Weinstein & McQuay, P.C., Boston, MA.

For ALTERA CORP, DAVID MASON, defendants: Joshua W. Cohen, Cummings & Lockwood, Stamford, CT.

For DATCOM TECH, INC, JOHN SALZILLO, PATRICK COUGHLIN, defendants: Robert B. Flynn, Tyler, Cooper & Alcorn, New Haven, CT.

For CATHERINE HARRINGTON, defendant: Judith Ann Ravel, Anne K. Millham, Branford, CT.

**JUDGES:** Gerard L. Goettel, United States District Judge.

**OPINIONBY:** Gerard L. Goettel

**OPINION:**

MEMORANDUM DECISION

Pursuant to Federal Rule of Civil Procedure 72, plaintiff J-Square Marketing, Inc. ("J-Square") [*2] objects to the Recommended Ruling of Magistrate Judge William I. Garfinkel, which was entered on the record at a hearing held on March 4, 1999. After reviewing the briefs submitted in connection with plaintiff's objections and the transcript of the March 4th hearing, and after a hearing on those objections before this Court held on July 12, 1999, we have made a de novo determination of the issues raised in the Recommended Ruling. Fed. R. Civ. P. 72(b); Local R. Mag. JJ. 2(b). Familiarity with the Recommended Ruling and the underlying facts are presumed. For the following reasons, this Court adopts, approves, and ratifies the Recommended Ruling as set forth herein. Consequently, we DENY plaintiff's objections (Doc. # 204).

DISCUSSION

Plaintiff raises multiple objections to the Recommended Ruling. We have divided the objections into two categories--one relating to the dismissal of the complaint, and the other relating to rulings on discovery issues.

Case 3:02-cv-02213-WWE    Document 25-2    Filed 03/05/2004    Page 10 of 17

Page 2
1999 U.S. Dist. LEXIS 12395, *

### A. Dismissal of the Complaint

As support for dismissal, the Magistrate cited both Rule 37 and Rule 41(b) of the Federal Rules of Civil Procedure. Rule 37 sets forth various sanctions, including dismissal of the action, [*3] that a court may impose in its discretion if a party disobeys a discovery order. Fed. R. Civ. P. 37(b)(2)(C). Rule 41(b) authorizes dismissal of an action for a plaintiff's failure to comply with the Federal Rules of Civil Procedure or "any order of court." Plaintiff argues that the Magistrate erred in relying on Rule 41(b) as a basis for dismissal. The Supreme Court has stated that:

> whether a court has power to dismiss a complaint because of noncompliance with a production order depends exclusively upon Rule 37, which addresses itself with particularity to the consequences of a failure to make discovery. . . There is no need to resort to Rule 41(b), which appears in that part of the Rules concerned with trials and which lacks such specific references to discovery.

Societe Internationale Pour Participations Industrielles et Commerciales, S. A. v. Rogers, 357 U.S. 197, 207, 2 L. Ed. 2d 1255, 78 S. Ct. 1087 (1958). Here, we find that dismissal is proper under either Rule 37 or Rule 41(b), because the case involves more than plaintiff's noncompliance with a discovery order or failure to produce discovery. Rather, the crux of the decision to dismiss plaintiff's [*4] complaint involves the manner in which plaintiff and plaintiff's counsel have conducted themselves during discovery. In any event, we review the Recommended Ruling in light of the factors applicable to both Rule 37 and Rule 41(b). As at least one court in this District has found, "the factors for dismissal under Rule 41(b) are helpful in considering a dismissal under Rule 37." Almonte v. Coca-Cola Bottling Co. of New York, Inc., 169 F.R.D. 246, 249 n.4 (D. Conn. 1996) (Dorsey, C.J.). We note that the Magistrate discussed all of these factors on the record at the March 4th hearing.

To determine whether a case should be dismissed under Rule 41(b), a court should consider: "(1) the duration of the plaintiff's failure to comply with the court order, (2) whether plaintiff was on notice that failure to comply would result in dismissal, (3) whether the defendants are likely to be prejudiced by further delay in the proceedings, (4) a balancing of the court's interest in managing its docket with the plaintiff's interest in receiving a fair chance to be heard, and (5) whether the judge has adequately considered a sanction less drastic than dismissal." Lucas v. Miles, 84 F.3d 532, 535 (2d Cir. 1996); [*5] Alvarez v. Simmons Mkt. Research Bureau, Inc., 839 F.2d 930, 932 (2d Cir. 1988). No single factor is dispositive. Spencer v. Doe, 139 F.3d 107, 113 (2d Cir. 1998). Additionally, a court may dismiss a case with prejudice under Rule 37(b) only after the court finds "willfulness, bad faith, or fault on the part of the party refusing discovery." Simmons v. Abruzzo, 49 F.3d 83, 88 (2d Cir. 1995); Bobal v. Rensselaer Polytechnic Institute, 916 F.2d 759, 764 (2d Cir. 1990), cert. denied, 499 U.S. 943, 113 L. Ed. 2d 459, 111 S. Ct. 1404 (1991) (citation omitted).

### 1. Duration

In weighing the duration of plaintiff's misconduct, we consider the age of the case, and the nature and duration of plaintiff's dilatory conduct. Spencer, 139 F.3d at 107; Jackson v. City of New York, 22 F.3d 71, 75 (2d Cir. 1994). The Magistrate found that this case involved "long-standing misconduct, and at least one instance of flagrant misconduct." Tr. of 3/4/99, at 72. We discuss the latter issue below as part of our consideration of bad faith or wilfulness on plaintiff's part. As the Magistrate [*6] noted, he has "tried to be patient with the plaintiff." Id. at 74. Indeed, we find that the Magistrate could not have done more in his efforts to move the discovery process along. For example, between August 1998 and March 1999, the Magistrate held four lengthy hearings to address a multitude of pending discovery motions.

One of the first instances of misconduct arose in January 1998. Defendant Catherine Harrington had filed a motion to amend her answer, affirmative defenses, and counterclaims. After more than a month, this Court granted that motion absent objection. Plaintiff then moved for reconsideration. In part, plaintiff argued that its counsel was "uncertain" as to whether Harrington's document, which was entitled "Request of Catherine Harrington for Leave to Amend Answer, Affirmative Defenses and Counterclaims," was in fact a motion that had been filed with the court. Although plaintiff's counsel wrote to Harrington's counsel for clarification, he did so well after his response time had run. Surely, plaintiff's counsel could have called the Clerk's Office to check the docket sheet, or accessed PACER himself, to determine whether Harrington's document had been [*7] filed with the court as a motion.

Second, on June 22, 1998, this Court ruled on plaintiff's motion nunc pro tunc for an order allowing it additional time to respond to requests for admission. While we granted plaintiff's untimely motion, we noted that many of the responses plaintiff had served were "completely improper." We thus directed plaintiff to serve proper responses to twenty-three requests for

admission. We further noted that plaintiff was dilatory with respect to discovery.

The third example relates to plaintiff's failure to timely produce documents to defendants Sipex Corporation and Emil Varano (collectively, the "Sipex Defendants"). At the July 12th hearing, C. Max Perlman, attorney for the Sipex Defendants, argued that there was a court order to produce sales representative agreements by September 25, 1998. See Order of Mag. J. of 8/26/98. Instead of producing the documents, on September 28, 1998, plaintiff moved to strike the document request, even though he received the document request in March. The filing of this motion was untimely because it was filed three days after the Magistrate ordered plaintiff to comply with defendants' discovery request.

The fourth [*8] example, which was cited by the Magistrate, involves two motions filed by plaintiff against defendant Harrington; one is a motion to compel, and the other is a motion for contempt. On January 26, 1998, plaintiff moved to compel discovery, including production of (1) medical records of the "health care providers whom Ms. Harrington has identified as providing treatment to her with respect to the claims which are the subject of her counterclaims;" or (2) executed medical authorizations allowing plaintiff to obtain these records. This Court granted that motion in part on April 1, 1998. The relevant section of the order stated that "Defendant Harrington will either execute medical authorizations or obtain and supply complete copies of all records since 1987 to plaintiff."

After Harrington had produced several sets of medical records, plaintiff requested the records of "psychiatric/psychological health care providers" between 1987 and 1992. Reuther Letter to Millham of 7/7/98, at 1. (Harrington's counterclaims raised an emotional distress claim). The dispute over these records was the subject of a hearing before the Magistrate on August 26, 1998. At the hearing, Harrington's counsel stated [*9] that there were no medical records which had not been produced. Tr. of 8/26/98, at 72. To the extent plaintiff sought records of any psychiatrists or psychologists who treated Harrington before 1987, the Magistrate found that plaintiff could inquire about Harrington's "earlier mental health treatment in an appropriate way, because you may want to know about, as anybody would in your situation, preexisting problems, underlying disorders, anything, you know, like that." Id. at 76.

Based on references to certain health professionals in the already-produced records, plaintiff's counsel then wrote Harrington's counsel on October 21, 1998 requesting additional medical records, including records from Harrington's gynecologist and otolaryngologist. In response, Harrington filed a motion for a protective order.

On December 4, 1998, the Magistrate held a show cause hearing during which he discussed the issue of producing Harrington's medical records, and particularly whether Mr. Jay Hanan, J-Square's president and owner, should have access to those records. The Magistrate ruled that Harrington did not need to produce any gynecological records because there was no claim of [*10] an emotionally-induced gynecological problem. Tr. of 12/4/98, at 77-78, 87-88. He then directed the parties to confer about preparing another confidentiality order, whereby the Court would review the documents in camera first, to determine if they should be shared with Hanan. Id. at 84-85. In the meantime, he ordered plaintiff's counsel not to share the already-produced psychological records with Hanan. Id. at 88. He then stayed all discovery for about a month--until January 15, 1999. Id. at 96-97. According to Harrington's counsel, plaintiff never attempted to reach an agreement on producing additional medical records. Instead, on February 18, 1999 plaintiff filed a Motion for a Finding of Civil Contempt Against Defendant, Catherine Harrington, and Imposition of Sanctions Under Fed. R. Civ. P. 37(b) for Failure to Obey the Court's April 1, 1998 Order.

This motion was one of the issues addressed during the March 4th hearing. The Magistrate found that plaintiff committed two distinct discovery abuses in connection with the filing of this motion. He first found that plaintiff did not proceed with discovery on the medical records [*11] issue in the "manner and scope that I directed." Tr. of 3/4/99, at 74. Indeed, the Magistrate had previously discussed this issue at hearings, not once but twice. Plaintiff did not provide a valid reason for not following the Magistrate's directions, except to plead ignorance. At the March 4th hearing, plaintiff's counsel stated, "I think I might be missing something." Id. at 58. He also stated, "All I want is the medical records" and that "those records should be simply produced to me." Id. at 59. Plaintiff is missing the point. This Court issued the April 1, 1998 Order in response to plaintiff's motion. Thus, the order was limited in its scope to records of Harrington's treating physicians who provided service between 1987 and 1992. The Order did not entitle plaintiff to all of Harrington's medical records. The parties clearly disputed plaintiff's entitlement to additional records. For plaintiff to have argued that the medical records issue was not an "outstanding" issue, is incredible.

The Magistrate next found that plaintiff's motion for contempt against Harrington was filed for an improper purpose. Specifically, he found that "the timing for the motion for contempt is [*12] so obviously related to the

allegations of misconduct against J-Square and Mr. Hanan." Id. at 75. Based on our review of the chronology of the events, we agree with the Magistrate that the contempt motion was filed as a counter-punch to the allegations raised against J-Square and Hanan. Moreover, the motion for contempt against Harrington was filed at a time when discovery had been stayed.

The fifth instance of plaintiff's misconduct relates to two motions filed by plaintiff regarding the testimony of Mrs. Lynn Eisenhauer at the December 4th hearing. Lynn Eisenhauer is married to Mr. Larry Eisenhauer, the former owner of Datcom, Inc. Mr. Eisenhauer sold Datcom, Inc. to Patrick Coughlin and John Salzillo, who later renamed the company to Datcom Technologies, Inc. After selling Datcom, Inc., Mr. Eisenhauer formed another company called Pro Action. Mrs. Eisenhauer attended the hearing to testify about a telephone call she received from Hanan regarding the Coughlin deposition. At the beginning of her testimony, counsel for the Datcom Defendants asked her about Mr. Eisenhauer's relationship to Datcom Technologies. She answered, "He has--he's--has nothing to do with Datcom Technology, [*13] Inc. [sic]." Tr. of 12/4/99, at 7. After this hearing, on February 1, 1999, plaintiff filed a Motion to Supplement the Record With Respect to Datcom's Motion for Contempt and to Strike Portions of Datcom's Reply Brief. The substance of this motion pertains to allegedly new information on the relationship among Pro Action, Datcom, Inc., and Datcom Technologies, Inc., in light of Mrs. Eisenhauer's testimony and plaintiff's recently-gained knowledge of several UCC-1 filings.

Then on March 4th, the same day as the hearing before the Magistrate, plaintiff filed a Motion for an Order to Show Cause Why a Finding of Perjury Should Not Be Made Against Non-Party Witness, Lynn Eisenhauer, and For a Finding of Subornation of Perjury Against Defendants, Datcom Technologies, Inc., John Salzillo and Patrick Coughlin. The Magistrate found that the motion against Mrs. Eisenhauer and the Datcom Defendants was filed for an improper purpose. To the extent the filing of this motion demonstrates plaintiff's bad faith or wilfulness, it is discussed below in section 6. Specifically, the Magistrate stated that the motion was "interposed for a tactical reason and that tactical reason was improper and the [*14] motion is frivolous." Tr. of 3/4/99, at 75. Similar to our reasons for finding that the motion for contempt against Harrington was filed for an improper purpose, we agree that the perjury motion was filed as a counter-punch. As of December 1998, plaintiff knew that a substantial fine had been awarded against it by the Magistrate (discussed below in section 5). Instead of meekly coming to court in March, plaintiff filed two motions to combat the motion on the order to show cause why J-Square and Hanan should not be held in contempt.

As the sixth example of plaintiff's misconduct, plaintiff's counsel, Charles Reuther, filed an affidavit containing confidential information in violation of the Confidentiality Order. On November 12, 1998, the deposition of Patrick Coughlin was taken, and the parties received the transcript of the deposition on November 24th. According to the Confidentiality Order, the substance of the deposition was to remain confidential for twenty days after the receipt of a deposition transcript by the deponent's counsel, or until December 14th. Yet, on December 3rd, Attorney Reuther filed an affidavit of his referring to Coughlin's testimony, without filing the affidavit [*15] under seal. This matter was discussed before the Magistrate at the December 4th hearing. The Magistrate stated, "I don't think there was anything intentional on Mr. Reuther's part with respect to violation of any order or intention to harm. But that's not the point. The harm doesn't have to be intentional to be done." Tr. of 12/4/98, at 49. Indeed, on the issue of sealing his affidavit, the following exchange took place between the Magistrate and Attorney Reuther:

> MR. REUTHER: My only point about raising this testimony--and I was trying to look at the order and I might have done it so quickly I--it was not intentional and I might have made a mistake. I have to admit that. I thought it was--my recollection was I wouldn't attach deposition testimony or confidential exhibits. But here it's clearly--which you're perfectly allowed to do, is to use it in connection with a court proceeding.
>
> THE COURT: Oh. Yes. It's just a question of whether it should have been sealed.
>
> MR. REUTHER: My affidavit. Yes.
>
> THE COURT: Right. Because--
>
> MR. REUTHER: That's a problem. I'll admit that.

Id. at 57. The Magistrate then warned Attorney Reuther about ensuring that [*16] he files under seal any court document containing confidential information.

There is also evidence that Attorney Reuther sent the Magistrate a letter, containing information on Harrington's medical and emotional history, without designating the letter as "confidential." See Defs.' Ex. 14. Harrington's medical records had previously been designated as confidential pursuant to the Confidentiality Order. While the letter is ostensibly about scheduling

matters, it contains extremely personal and sensitive information on Harrington. Based on this letter, Harrington's counsel filed a motion for contempt. While the Magistrate denied the motion for contempt, we nevertheless find that the letter is the seventh example of plaintiff's abusive tactics.

The eighth and final example covers several instances of misconduct. Throughout the course of discovery, we find that plaintiff has failed to comply with Local Rule 9, which requires parties to confer before filing a discovery motion pursuant to Rules 26 through 37, Fed. R. Civ. P., in an attempt to resolve the dispute among themselves. For example, before Attorney Reuther filed his motion to strike on September 28, 1998, he did not contact [*17] counsel for the Sipex Defendants. See Tr. of 11/17/98, at 9-10. Nor did he confer with Harrington's counsel before filing the motion for contempt on February 18, 1999. Additionally, as part of plaintiff's March 4th perjury motion, plaintiff moved to strike portions of Datcom's confidentiality designations on the Coughlin deposition. Before filing this motion, plaintiff never conferred with Robert Flynn, counsel for the Datcom Defendants. See Tr. of 3/4/99, at 7-8 (arguments of Attorney Flynn describing his efforts to contact plaintiff to discuss the issue of confidentiality designations); Defs.' Ex. 1 at 3/4/99 Hrg. (letter from Flynn to Reuther requesting that they confer about the confidentiality designations). As the Magistrate noted at the hearing, "there was no reason for the plaintiff to file a motion at this point. Datcom had been making conscientious efforts to address sealing issues. There had been no conference. There is just a motion." Tr. of 3/4/99, at 75.

While we do not find that plaintiff was solely responsible for the contentiousness of this case, n1 we nevertheless find that plaintiff has committed numerous and substantive abuses over an approximately eighteen-month [*18] period (from January 1998 to July 1999). At a minimum, the discovery abuses continued repeatedly over an eight and a half month period, between this Court's June 22 order and the Magistrate's Recommended Ruling. See Lyell Theatre Corp. v. Loews Corp., 682 F.2d 37, 42-43 (2d Cir. 1982) (stating that dilatory conduct "may warrant dismissal after merely a matter of months"). Consequently, we find that the duration and the nature of plaintiff's misconduct during discovery tips in favor of dismissal.

---

n1 Indeed, Reuther stated on the record that "this is a very contentious case. And I'm sensitive to that. I accept it." Tr. of 12/4/98, at 80. We note that the underlying facts involve a spurned romance between Hanan and Harrington. We thus recognize that Attorney Reuther could be representing a vindictive client.

---

### 2. Notice

Plaintiff was on notice as early as June 22, 1998 that its complaint could be dismissed. In a ruling issued on that date, this Court stated:

> We must observe that plaintiff [*19] having filed this (and an earlier action) seems nevertheless determined not to have the action and the counterclaim proceed. It has been extremely dilatory in making all types of discovery. We put the plaintiff on notice that this sort of behavior will no longer be tolerated and that it is in jeopardy of having its complaint stricken.

Order of 6/22/98, at 2. Plaintiff received another warning at the November 17th hearing when the Magistrate issued an Order to Show Cause Why J-Square and Mr. Hanan Should Not Be Found in Contempt for Violating the Confidentiality Order. Tr. of 11/17/98, at 33. Speaking to Attorney Reuther, the Magistrate stated, "Your behavior in this case has been abominable and it's been found abominable by Judge Goettel and I'm finding it abominable. Your client is in serious trouble. Your client may very well have done an egregious act with respect to confidentiality. He is in serious, serious, serious trouble." Id. at 39. Then at the December 4th hearing, the Magistrate decided he would defer ruling on the order to show cause so that he could confer with this Judge. Tr. of 12/4/98, at 71-73. Accordingly, we find that the notice factor tips [*20] in favor of dismissal.

### 3. Prejudice

In weighing the prejudice to defendants, we consider whether they are likely to be prejudiced by further delay in the proceedings. Defendants argue that plaintiff's abuses have continued to increase as the case has progressed, and that they will be prejudiced if it continues because they will be forced to expend additional time and incur unnecessary expenses defending themselves against frivolous motions. As the Magistrate found, "there is extreme prejudice by [plaintiff's] repeated misconduct. The cost, the stress, the waste of time is phenomenal." Tr. of 3/4/99, at 76. We agree. However, the prejudice factor does not entirely weigh in favor of dismissal, because the case will continue on Harrington's counterclaims. Moreover, the Magistrate ordered plaintiff to pay all fees and costs of each of the defendants from the outset of the case, except

for the fees and costs associated with Harrington's counterclaims. Id. at 77-78.

### 4. Docket Congestion

Under the fourth factor, we balance the court's interest in calendar management against plaintiff's due process rights. In this respect, we must consider that this case [*21] was originally filed in October 1995 in the U.S. District Court for the Southern District of New York, but that action was dismissed without prejudice for improper venue. Plaintiff then re-filed its complaint in June 1996 in the Eastern District of New York. The action was transferred to the District of Connecticut on May 6, 1997. Discovery did not proceed in earnest until after this Court's decision, on August 20, 1997, granting in part and dismissing in part defendants' motions to dismiss, and for judgment on the pleadings. The case has been entrenched in the discovery phase ever since.

On the one hand, we have a case that has been in the discovery phase for approximately two years. See Spencer, 139 F.3d at 113-14 (considering the age of the case in weighing the court's interest in calendar management). As evidenced by the efforts of this Judge and the Magistrate, this Court has been very active in assisting the parties through this process. In fact, this Court referred the case to the Magistrate for all purposes except trial due to the amount of time we were spending on discovery issues. The Magistrate has held four lengthy hearings and has had several status conferences. [*22] On the other hand, we find that plaintiff has been given a fair chance to be heard at every turn. As the Magistrate stated, "J-Square has had more than its due of due process, and it's abused what it's had." Tr. of 3/4/99, at 77. Thus, we find that the balance favors dismissal.

### 5. The Efficacy of Lesser Sanctions

Sanctions were first awarded against plaintiff in August 1998 in the amount of $ 300 for plaintiff's failure to comply with defendant Harrington's discovery requests. See Tr. of 8/26/98, at 61, 107-08. The Magistrate recognized the size of the award was low, but he stated that "it's more of a message." Id. at 108. He further stated, "I don't want to be overly harsh." Id. The Magistrate again imposed costs against plaintiff at the December 4th hearing. He found that the question was not whether to assess costs, but how much. Tr. of 12/4/98, at 74. At the time, the Magistrate did not fix the level of costs, because he wanted defendants to update their requests, and he wanted to give plaintiff an opportunity to respond. Id. Finally, at the March 4th hearing, the Magistrate found that plaintiff's behavior was likely to be repeated. Tr. of 3/4/99, at [*23] 76-77. He stated, "There just isn't any effective deterrent with [plaintiff] other than termination of the case. There just isn't anything else that would be effective." Id. at 77.

This Court finds that if plaintiff's action were allowed to continue, money fines alone would not prevent further misconduct by plaintiff. Plaintiff has received warnings in the past, both from this Judge and the Magistrate Judge, and they have been ineffective. Despite these warnings, at the March 4th hearing plaintiff's counsel asserted that "I don't understand half of what's being said here this morning against me. I really don't." Id. at 43. At the July 12th hearing before this Court, plaintiff's counsel further indicated that he did not perceive any problems on his part or the part of his client. Instead, he asserted that plaintiff had produced everything it has needed to, it had complied with all discovery orders, and all of the discovery motions he filed were necessary. The position of plaintiff's counsel shows that he has his head stuck firmly in the sand, and he is not about to take it out.

### 6. Bad Faith, Wilfulness, or Fault of Plaintiff

Lastly, we consider whether there was bad [*24] faith, wilfulness, or fault on plaintiff's part. Bad faith or wilfulness "imply a deliberate disregard of the lawful orders of the court." Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp., 602 F.2d 1062, 1067 (2d Cir. 1979).

Plaintiff's bad faith is first demonstrated by the Magistrate's finding that Hanan testified falsely at the December 4th hearing. Tr. of 12/4/98, at 72-73. At the November 17th hearing, the Magistrate entered an Order to Show Cause Why J-Square and Mr. Hanan Should Not Be Found in Contempt for Violating the Confidentiality Order. Tr. of 11/17/98, at 33. The show cause hearing was held on December 4th, and related to the telephone call between Hanan and Mrs. Eisenhauer. Both Mrs. Eisenhauer and Hanan testified at the December 4th hearing.

The Magistrate found that Mrs. Eisenhauer's testimony was "perfectly credible" because he had the opportunity to see her demeanor on both direct and cross examination. Tr. of 3/4/99, at 71. Indeed, the Magistrate had a chance to listen to her testimony and evaluate it in the context of all the events of this case. He stated that he was "convinced that she was truthful and was testifying accurately [*25] to the best of her ability." Id.; see Tr. of 12/4/98, at 72. In contrast, he found Hanan's testimony at the hearing to be "incredible" in light of the overall context of the situation, including the contradictions with Ms. Eisenhauer's testimony, and taking into consideration Hanan's demeanor and the manner in which he testified. Tr. of 3/4/99, at 73; see Tr. of 12/4/98, at 72-73. At the December 4th hearing, he stated, "And the thing that's so disturbing here is that I think Mr. Hanan testified falsely, and about an issue that--and intentionally so, about an issue that was not a

dispositive issue in the case. But it gives me tremendous concern about what's going on in this case." Tr. of 12/4/98, at 72-73. He thus concluded that Hanan lied "with impunity" on the stand. Tr. of 3/4/99, at 73. He also found by clear and convincing evidence that "he got on the stand and lied." Id.

The second instance of bad faith and wilfulness also relates to the telephone call between Hanan and Mrs. Eisenhauer. The Magistrate found that there was misconduct not simply on the part of plaintiff's counsel, but by the client himself. Tr. of 3/4/99, at 72. On February 27, 1998, this Court [*26] had entered a Confidentiality Order governing the "production and use of all documents, testimony and all other such information produced during discovery in this action." Order of 2/27/98, at 1. With respect to deposition testimony, the Confidentiality Order provided that "all oral testimony, regardless of whether a [confidential] designation was made on the record, shall be treated as CONFIDENTIAL and subject to this Confidentiality Agreement until twenty (20) days after the transcript of the deposition has been received by the party whose CONFIDENTIAL designated documents, material or information is involved." Id. § 4, at 2. The Magistrate found that Hanan attempted to violate this Confidentiality Order by attempting to communicate improperly with Mr. Eisenhauer regarding the deposition of Patrick Coughlin. Tr. of 3/4/99, at 72. The Magistrate had previously stated, "I'm inclined to agree with the Defendants that while there wasn't a disclosure of specific content, there was activity that was improper." Tr. of 12/4/98, at 72. The Magistrate concluded that "dismissal should be used sparingly when you're dealing with the failures and acts and omissions of counsel. It's certainly [*27] more appropriate when you're dealing with the misconduct of the actual party himself and that's what we have here. We have someone who attempted to violate a confidentiality order in bad faith." Tr. of 3/4/99, at 72-73. n2

> n2 Plaintiff argues that the Magistrate erred by failing to specify the provision of the Confidentiality Order that was allegedly violated. Based on our review of the hearing transcripts, the provision at issue was clearly understood by the parties. To the extent plaintiff argues that the Magistrate relied on the attempted violation of the Confidentiality Order as the sole basis for dismissal, plaintiff misunderstands the test for dismissals under Rule 37 and Rule 41(b). The attempted violation of the Confidentiality Order is just one example of plaintiff's bad faith. We need not decide whether the attempted violation, standing alone, would be reason enough for dismissal.

The final example of plaintiff's bad faith and wilfulness pertains to two motions on Mrs. Eisenhauer's testimony. The first [*28] one was filed by plaintiff on February 1, 1999 and is a Motion to Supplement the Record With Respect to Datcom's Motion for Contempt and to Strike Portions of Datcom's Reply Brief. The second one was received by the Court on March 4th and is a Motion for an Order to Show Cause Why a Finding of Perjury Should Not Be Made Against Non-Party Witness, Lynn Eisenhauer, and For a Finding of Subornation of Perjury Against Defendants, Datcom Technologies, Inc., John Salzillo and Patrick Coughlin. These motions raise claims that Lynn Eisenhauer perjured herself at the December 4th hearing, and that the Datcom Defendants suborned perjury. The motions also suggest that Robert Flynn, attorney for the Datcom Defendants, suborned perjury. As discussed briefly above in Section 1, the Magistrate found that these motions were "frivolous." Id. at 75. Indeed, he stated:

> the motion with respect to the Eisenhauer testimony, it's not just frivolous, it's pernicious. What it does is it just slings mud at perfectly honorable counsel and takes a comment from Ms. Eisenhauer's testimony that I think all counsel, other counsel and the Court, understood in context and really was not misleading in light [*29] of the representations of Datcom's own counsel concerning the debtor/creditor relation and tries to make it a basis for the most extreme allegations and the most extreme sanctions perhaps that would be available. It's just wrong. It's bad practice. It's improper and I'm puzzled by, Mr. Reuther, by your conduct because I don't get the impression that you're a bad lawyer or a bad guy.

Id. at 75-76. We find that these three examples are sufficient evidence that plaintiff and plaintiff's counsel have acted wilfully and in bad faith during discovery.

### B. Objections on Discovery Issues

Besides objecting to the portion of the Recommended Ruling dismissing the complaint, plaintiff raised several other objections to the Magistrate's rulings on discovery issues. First, plaintiff objects to the Magistrate's denial of its motion of March 4, 1999 for an Order to Show Cause Why a Finding of Perjury Should Not Be Made Against Non-Party Witness, Lynn

Eisenhauer, and For a Finding of Subornation of Perjury Against Defendants, Datcom Technologies, Inc., John Salzillo and Patrick Coughlin. See id. at 70. After reviewing the hearing transcripts and the various motion papers, [*30] we uphold the Magistrate's finding that Mrs. Eisenhauer did not commit perjury and the Datcom Defendants did not suborn perjury. n3 Thus, we deny plaintiff's fourth objection.

> n3 As mentioned earlier, Mrs. Eisenhauer denied any connection between her husband and Datcom Technologies, Inc. Plaintiff relied upon the fact that when Mr. Eisenhauer sold his business to Coughlin and Salzillo, the sale price was to be paid over a period of time. Consequently, as is common, Mr. Eisenhauer had a security lien against the property involved, until such time as the payments were completed. Mr. Eisenhauer never needed to enforce this lien since the payments went forward appropriately. This minor fact cannot possibly support a claim of perjury.

Plaintiff next raises an objection about the section of its March 4th motion for an order striking Datcom's confidentiality designations as to specified pages and lines of the Coughlin deposition. Plaintiff argues that this issue was not properly addressed by the Court at the March 4th [*31] hearing. In light of the dismissal of the complaint, we find that this issue is moot. Thus, we deny plaintiff's fifth objection.

CONCLUSION

As the Magistrate stated, "I think if there is ever a case that I have seen in practice or in my time here as a judge that deserves to be dismissed for long-standing misconduct, and at least one instance of flagrant misconduct, it's this one." Tr. of 3/4/99, at 72. We agree because we find that, except for the prejudice factor, all the factors applicable to dismissals under Rule 37 and Rule 41(b) have been met in this case. Although we recognize that a dismissal with prejudice is the harshest sanction available, we find this case presents "extreme circumstances." Lucas, 84 F.3d at 535.

In sum, plaintiff has committed numerous and substantive discovery abuses, including: failing to object to one of defendant Harrington's motions and subsequently filing a motion for reconsideration, serving improper responses to requests for admission, attempting to violate the Confidentiality Order in bad faith, referring to confidential material in documents without filing the document under seal or designating the document as confidential, [*32] failing to comply with the Local Rules' requirement about conferring before filing discovery motions, lying under oath at a court hearing, filing eleventh-hour motions with improper purposes, and failing to timely respond to a discovery request--by producing the documents, moving to strike the request, or moving for an extension of time. The Second Circuit has upheld dismissals in cases involving far fewer instances of misconduct under Rule 37 and Rule 41(b). See, e.g., Baba v. Japan Travel Bureau Int'l, Inc., 111 F.3d 2, 5 (2d Cir. 1997) (affirming dismissal, under Rule 37(b), of discrimination claims against an employer based on the plaintiff's wilful disregard of the court's discovery orders for over a year, and persistence in her behavior despite repeated warnings that the case could be dismissed); Valentine v. Museum of Modern Art, 29 F.3d 47, 49-50 (2d Cir. 1994) (affirming the dismissal of a pro se plaintiff's employment discrimination complaint based on the plaintiff's sustained and wilful intransigence despite the court's clear and repeated warnings that failure to appear at his deposition would result in dismissal); Bobal, 916 F.2d at 765-66 [*33] (order on rehearing) (upholding the dismissal of a pro se plaintiff's complaint under Rule 37 for the plaintiff's failure to appear for her deposition despite a court warning that failure to do so would result in dismissal); John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc., 845 F.2d 1172, 1176-77 (2d Cir. 1988) (affirming a dismissal under Rule 37(b)(2) based on the third-party plaintiff's failure to provide meaningful discovery despite three court orders, which included two warnings that dismissal was possible); Lyell Theatre, 682 F.2d at 42-43 (affirming a dismissal under Rule 41(b) where the plaintiff did not honor its commitments, did not pursue the case for about two years, and contributed to multiple adjournments and delay over the seven-year history of the case, and noting that the Second Circuit had "affirmed dismissals in cases far less egregious than this").

One section of the Recommended Ruling to which plaintiff did not object pertains to the issue of attorney's fees. At the March 4th hearing, the Magistrate ordered "appropriate sanctions in the payment of all fees and costs of each and every defendant from the outset of this [*34] case, with the exception of fees and costs related solely to the Harrington counterclaim." Tr. of 3/4/99, at 77-78. To the best of this Court's knowledge, there is a status conference scheduled in this case for Monday, August 23, 1999. We leave for the Magistrate to decide the issue of the amount of attorney's fees to be awarded to each defendant.

For the foregoing reasons, this Court adopts, approves, and ratifies Magistrate Judge Garfinkel's Recommended Ruling as set forth herein. Thus, we DENY plaintiff's objections to the Recommended Ruling (Doc. # 204).

**SO ORDERED.**

**Dated: August 9, 1999**

**Waterbury, CT**

**Gerard L. Goettel**

**United States District Judge**